805 P.2d 120 (1990)
In the Matter of L.S., a minor child.
STATE of Oklahoma and L.S., Appellees,
v.
Barbara CREVISTON and Bruce Crevistion, Appellants.
No. 73985.
Court of Appeals of Oklahoma, Division No. 2.
October 23, 1990.
David L. Moss, Dist. Atty., William D. LaFortune, Asst. Dist. Atty., Renee Waisner, Asst. Public Defender, Tulsa, for appellees.
Randal D. Morley, Tulsa, for appellant Barbara Creviston.
Chris Economou, Tulsa, for appellant Bruce Creviston.
Released for Publication by Order of the Court of Appeals of Oklahoma, Division No. 2.
*121 BRIGHTMIRE, Chief Judge.
Does fundamental error permeate the proceedings which culminated in the termination of the parental rights of the minor L.S.'s parents?
We hold it does and vacate the orders appealed.

I
On March 12, 1987, two-year-old L.S. was taken by her natural father, appellant Bruce Creviston, to Hillcrest Medical Center to be examined for injuries she had sustained, namely "a large lump on the side of her head, bruising on her arm and significant hair loss on the side of her head." Suspecting physical abuse, the medical authorities notified the Department of Human Services (DHS), which placed L.S. in emergency foster care. A petition alleging that L.S. is a deprived child was filed March 20, 1987. On April 22, 1987, L.S.'s natural mother, Barbara Creviston, joined her husband in stipulating to the allegations of the petition and L.S. was declared a deprived child and was made a "ward of the Court and is continued in the legal custody of the Department of Human Services."
On May 7, 1987, the DHS caseworker assigned to work with the family filed a report in which she recommended to the court suggested standards of conduct for the parents to follow in order to avoid termination of their parental rights. In the report the worker noted Barbara's "limited level of functioning" and the "fear" the child displayed in the presence of her father. The court adopted the recommendations and incorporated them in its May 20, 1987, "Order[s] of Judicial Standards of Conduct." Among other things the parents were ordered to pay monthly child support, participate in a parenting skills program, initiate contact with the caseworker at least twice a month, attend counseling sessions with an accredited therapist, and undergo psychological assessments by an accredited psychiatrist or psychologist. The court also decreed that until the therapist and the caseworker agreed that it would be in the child's best interest, the father "is to have no visitation with said child."
The parents, both of whom were unemployed and neither of whom can read or write, attended all five sessions of a Parents Anonymous [now Child Abuse Prevention Services] "intake group" but the director of the program noted that "no progress was made with regard to clarifying what had happened to [L.S.]" and the parents would have to repeat the course. They continued individual counseling.
In August 1987, the DHS caseworker reported that the Crevistons, who were preparing for the birth of their second child, were "very cooperative and responsible," were attending parenting classes, had begun a second "intake group" on November 18, 1987, and were generally complying with the court-ordered standards. Little else appears in the record until December 8, 1987, when the worker, apparently pleased by the parents' progress, filed a "Notice of Change in Placement" informing the court that "pursuant to the treatment plan" the child was being moved "from foster care to own home." L.S. was going to be home for Christmas. Attached to the notice was a counseling service analysis of Barbara in which she was described as having "mild retardation." The report went on to chronicle significant traumatic events in Barbara's life and concluded by noting that she had a dependent personality and the inability "to make social judgments regarding needs." The court-ordered psychological profile of the father had not been commenced.
L.S. was dropped off at her parents' apartment on December 14, 1987. On Saturday, *122 December 19, the father called the family pediatrician complaining that L.S. had slipped on some ice-covered stairs and bruised her buttocks and legs. She was examined by the doctor the following Monday. In a letter to the DHS caseworker, the doctor described "multiple bruises with somewhat of a hand print mark on the left leg posteriorly with multiple bruises on the buttocks and lower right leg," "[a] large bite-like area ... which the father stated that a cousin ... had bit her," "healing abrasions on the face which father indicated the child had scratched herself, as well as healing scars and what appeared to be burns on the upper ears bilaterally, which father stated happened accidentally when he was blow drying her hair." The doctor concluded that "[b]ecause of the extensiveness of the injuries ... I feel that this child has probably undergone physical abuse. Although the descriptions of how the accidents were sustained are somewhat compatible with the physical findings, the overall incidence of injuries are quite suspicious."
Later that same day the parents, accompanied by L.S. and her infant brother, arrived for their scheduled individual counseling appointments at Parents Anonymous. According to the program director's report, when they arrived the father "stated they had just come from the doctor's office and the doctor had said, `we'll lose [L.S.] over what he saw today.'" The parents proceeded to their counseling session, taking the children with them. Staff members asked if L.S. could go to another room to play and, once there, they examined the child, contacted DHS and the police, and the child was again placed into DHS protective custody. According to a counselor present at the time, the father "threatened to blow up the [DHS] offices." He does not deny this, but says that he had been encouraged by the staff to be open and honest with them, and he felt betrayed by what he perceived as a "trick" to get L.S. away from him.
On January 13, 1988, the parents attended the final session of their second intake group. When told they would again have to repeat the procedure the father became angry and the parents left the meeting. Another worker involved in the case said in her written report that the father told her of "his plan to purchase a machine gun, go to Child Abuse Prevention Services office and `blow everyone away.'" As a result of the threats, the director says they "terminated services" and informed DHS of the threats.[1] At some point in the spring, the parents tried to rejoin the counseling group but were refused.
On March 10 and April 13, 1988, the father appeared for his required psychological evaluation. The doctor did not administer the standard Minnesota Multiphasic Personality Inventory test (MMPI) because the father "can neither read or write," the test would have to be read to him, and "I frankly neither had the time or personnel to repeat this procedure." Nonetheless, the doctor offered an opinion based on "behavioral observation, clinical impression, interviews, and mental status examination." The doctor noted the father's "years in institution settings (e.g. C.M.C., Hissom, Enid)," an automobile accident in 1979 with resulting "brain damage and seizure disorders," and the "intellectual limitations of *123 the parents" as grounds for his conclusion that L.S. should not be returned to the home at that time.
A second psychological evaluation of the father, which included an oral MMPI and a Rorschach test, was conducted May 5, 1988. The psychologist noted that although the father is "a warm outgoing, rather gregarious individual" his "neurological trauma producing organic brain injury" coupled with the fact that the father comes from a "dysfunctional family and was reared in institutions for the mentally retarded since he was 8 or 9 years old" have resulted in "a tense, restless person experiencing considerable distress." The doctor noted that the father "is likely to be chronically frustrated because of inability to attain high goals." The father's responses to the Rorschach test were "decidedly overproductive for a person of borderline intelligence (I.Q. reported to be 78)" and revealed "an inordinate or frustrated need for love and affection, strong feelings of inadequacy, and a potential for depression." The doctor concluded that the father "may have some brain damage as well as serious personality problems" and that "[p]roblems with impulse control constitute his major liability" and that "[m]edication may be indicated which could help with impulse control." He noted that the father's "ability to anticipate and gauge accurately the effects of his words and actions on others, particularly those in a position to give or withhold from him his wishes, is severely impaired." The doctor viewed the return of L.S. to the home at that time as "unacceptable" and recommended further professional help for the father.
On July 6, 1988, motions to terminate the parental rights of the parents were filed alleging failure to comply with the court-ordered standards. Hearing on the matter was passed several times.
In the meantime the parents attended a parenting skills class at Childrens' Medical Center in January and February of 1989. The class "facilitator" noted the parents' "limited mental capacity" and in fact said that the mother on numerous occasions "verbalized a lack of understanding about the material that was presented" that is, "she couldn't understand ... the wording; the concepts." At the conclusion of the "program the parents were informed that they had not successfully completed the course and the facilitator told them "[it is] recommended that they not continue based on their inability to profit from the information and to use it."
On April 25, 1989, amended petitions to terminate were filed to include information omitted from the original motions, such as additional facts and the statutory grounds for the requested terminations. The motions alleged that the father had abused the child and that the mother had failed to prevent the abuse. Hearings were held May 22, 23 and 30, and June 9, 12 and 13, 1989, after which the court ordered the parental rights of the parents terminated on the grounds that "efforts to reunite the family have failed" and that it is in the "best interests of the child" to do so. The parents appeal.

II.
The propositions of trial court error raised by the parents need not be considered due to an unraised, reversible error of a fundamental naturefailure of the terminations to be supported by the law.
First of all, the orders of termination fail to make statutorily mandated predicatory findings. The amended motions filed by the state allege as grounds for the terminations violations of 10 O.S. Supp.1988 § 1130(A)(3) and (A)(5)(b)[2] which *124 allow a court to terminate parental rights based upon specific findings. Conspicuously absent from the challenged orders is any reference to the statutory grounds for the terminations or any findings satisfying the statutory requirements. The court simply has not made the findings required by § 1130(A)(3)(b), (c) or (d) or (A)(5)(b).
As mentioned earlier, the only grounds recited in the orders are the best interest of the child and the failure of "efforts to reunite the family." While the best interest of the child is, of course, a significant consideration in termination proceedings, it is not the only one. The rights of the parents are also important. To protect the rights and interests of both parent and child the legislature has specified predicatory procedures to be followed and facts to be found. Although there appears to be evidence supportive of certain underlying facts in this case, the issues of fact have not been determined. The orders are not responsive to the pleadings and do not comply with the fundamentals of the law. They must be vacated.
There is a second, equally serious problem and related defect in the proceedings belowthe rights of the parents were not determined in accordance with the proper statutory criteria. Prior to 1987 "our termination of parental rights statute [did] not explicitly address itself to the situation of mentally ill parents." In re J.N.M., 655 P.2d 1032 (Okl.1982). In response to this statutory omission, the legislature enacted 10 O.S.Supp.1988 § 1130(8),[3] which authorizes parental termination if the evidence demonstrates that the mental illness or deficiency of a parent will result in harm or threatened harm to a child and that such mental condition is not treatable or controllable.
The statute incorporates the following provisions of 43A O.S.Supp.1989 § 6-201:
"(f) `Mental illness' shall mean mental disease to such extent that a person so afflicted requires care and treatment for his own welfare, or the welfare of others, or of the community.
(g) `Mental deficiency' shall mean mental deficience as defined by appropriate clinical authorities to such extent that a person so afflicted is incapable of managing himself and his affairs, but shall not include mental illness as defined herein."
The evidence below is replete with references to the mother's "retardation" and other severe developmental handicaps as well as the father's "borderline intelligence," "organic brain injury," "serious *125 personality problems" and "seizure disorder" with the possibility of treatment and control by medication. Such evidence is largely undisputed. By the state's own admission the parents are "handicapped" and have mental "inabilities."
It is well settled that a special statutory provision prevails over a general one. Southwestern Bell Tel. Co. v. Oklahoma County, 618 P.2d 915 (Okl.1980). Given the specificity of § 1130(8), and the undisputed and overwhelming evidence of the parents' limited mental capacities, we believe that the trial court erred in failing (1) to require professional testimony as a foundation for determining whether either of the parents fall within the definitions of "mental illness" or "mental deficiency," (2) to assess their compliance with the court-ordered standards of conduct in light of such evidence, and (3) to make the necessary and relevant findings of the parents' mental status vis-a-vis the specific statutory provisions in support of its conclusion regarding the state's motions to terminate parental rights.

III
The orders appealed are therefore reversed and the cause is remanded with directions to give the state an opportunity to proceed in accordance with the law. In view of the undisputed evidence of past abuse, L.S. is to presently remain in the custody of the state.
REIF, P.J., concurs.
MEANS, J., dissents.
MEANS, Judge, dissenting.
I respectfully dissent.
The State of Oklahoma, in its executive capacity, moved to terminate the parental rights of both parents pursuant to the provisions of 10 O.S.Supp.1988 § 1130(A)(3) and 10 O.S.Supp.1988 § 1130(A)(5)(b).
The supreme court stated in Matter of T.R.W., 722 P.2d 1197, 1203 (Okla.1985), applying the standard of review in that termination case:
As set forth in Part II of this opinion we have examined the evidence before the trial court and have determined that the evidence supports the jury verdict in the deprived action. That review has also established that the evidence presented rises to the level of clearly and convincingly supporting a finding that abuse of a heinous and shocking nature was inflicted on appellant's son and that the nature of this abuse was such that appellant had notice of its infliction and failed to protect his son. (Footnote omitted.)
The record in this case contains clear and convincing evidence supporting the trial judge's decision to terminate the parental rights under the authority of the above statutes.
I would affirm.
NOTES
[1] At the termination hearing, the worker testified as to her recollection of the event, which occurred before any psychological evaluation of the father, as follows:

"A. [H]e stated that at the first of the month he was going to get a submachine gun, that he knew they were illegal but he knew some people that he could buy it from.
Q. What did he say he was going to do with that submachine gun?
A. He was going to kill them.
....
Q. What was [the mother's] response to that statement?
A. She was quiet during this time, and then she quietly spoke and told Bruce that he couldn't use her money and she wouldn't help him to kill them.
....
A. Then he stated that he was going to use his own money and that he didn't need Barbara's help, that she wouldn't be there.
....
He had some friends from Iowa that he was planning on getting a hold of and helping him."
[2] Subject statute reads:

"3. A finding that:
a. the child is deprived, as defined in this chapter, and
b. such condition is caused by or contributed to by acts or omissions of his parent, and
c. termination of parental rights is in the best interests of the child, and
d. the parent has failed to show that the condition which led to the making of said finding has not been corrected although the parent has been given three (3) months to correct the condition; provided, that the parent shall be given notice of any hearing to determine if the condition has been corrected. The court may extend the time in which such parent may show the condition has been corrected, if, in the judgment of the court, such extension of time would be in the best interest of the child. During the period that the parent has to correct the condition the court may return the child to the custody of its parent or guardian, subject to any conditions which it may wish to impose or the court may place the child with an individual or an agency, or
....
5.
....
b. the parent has physically or sexually abused the child or a sibling of such child or failed to protect the child or a sibling of such child from physical or sexual abuse subsequent to a previous finding that such parent has physically or sexually abused the child or a sibling of such child or failed to protect the child or a sibling of such child from physical or sexual abuse."
[3] Section 1130(8), enacted by Laws 1987, c. 95, § 1 (effective May 18, 1987), reads:

"A finding that all of the following exist:
a. the child is deprived as defined in this chapter, and
b. custody of the child has been placed outside the home of a natural or adoptive parent, guardian or extended family member, and
e. the parent whose rights are sought to be terminated has a mental illness or mental deficiency, as defined by paragraphs f and g of Article II of Section 6-201 of Title 43A of the Oklahoma Statutes, which renders the parent incapable of adequately and appropriately exercising parental rights, duties and responsibilities, and
d. the continuation of parental rights would result in harm or threatened harm to the child, and
e. the mental illness or mental deficiency of the parent is such that it will not respond to treatment, therapy or medication and, based upon competent medical opinion, the condition will not substantially improve, and
f. termination of parental rights is in the best interests of the child.
Provided, a finding that a parent has a mental illness or mental deficiency shall not in and of itself deprive the parent of his parental rights." (Emphasis added.)