66 P.3d 1004 (2003)
2003 OK CIV APP 29
In the Matter of C.R.T., an alleged deprived child,
Gail Thomason, Plaintiff/Appellant,
v.
State of Oklahoma, Defendant/Appellee.
No. 96,753.
Court of Civil Appeals of Oklahoma, Division No. 2.
February 24, 2003.
*1005 Avery A. Eeds, Jr., Elk City, OK, for Plaintiff/Appellant.
Richard L. Dugger, District Attorney, Gina R. Farris, Assistant District Attorney, Arapaho, OK, for Defendant/Appellee.
Released for Publication by Order of the Court of Civil Appeals of Oklahoma, Division No. 2.
Opinion by KEITH RAPP, Judge:
¶ 1 The trial court defendant, Gail Thomason (Mother), appeals the judgment entered on a jury verdict terminating her parental rights as to her child (CRT). The termination petition was filed by the State of *1006 Oklahoma (State). This Court reverses and remands for a new trial.

BACKGROUND
¶ 2 The parties have little dispute about the facts. Mother suffers mental illness and, possibly, alcohol and drug abuse induced mental illness. CRT was placed in emergency custody of the Department of Human Services (DHS) in February 1999, and was adjudicated as a deprived child in April 1999, on the State's petition, alleging grounds based upon Mother's mental health condition. The State alleged that Mother "has severe mental problems which makes(sic) it impossible for her to provide for the needs" of CRT as its ground for the alleged state of deprivation.[1] Among other items, the Mother's mental health treatment plan required her to contact, maintain contact, and follow the directions of unnamed mental health services.
¶ 3 CRT has been in foster care since that time. CRT's Father's parental rights have been terminated and that is not an aspect of this case.
¶ 4 The State filed an amended petition to terminate Mother's parental rights on June 4, 2001. The grounds alleged CRT had been in foster care for 15 of the last 22 months, Mother's failure to complete treatment plan, Mother's failure to correct the conditions leading to the deprived status adjudication, and that it was in CRT's best interest to terminate Mother's parental rights. The appropriate subsections, not stated in the petition, are 10 O.S. Supp.2000, § 7006-1.1(5) and (15).[2] The State did not specifically allege as grounds for termination the mental illness provisions of 10 O.S. Supp.2000, § 7006-1.1(A)(13), although its petition contained the non-specific catchall "et seq."[3]
¶ 5 Mother demanded, and was provided, a jury trial. At the close of the evidence, the trial court instructed the jury as to the State's theory under subsections 5 and 15. The court also instructed the jury, at Mother's request, as to the elements of subsection *1007 13.[4] The jury's verdict was general and did not specify whether its decision encompassed one or all of State's theories.
¶ 6 However, the trial court's judgment recited that termination was based upon remaining in foster care for the requisite period of time and for Mother's failure to complete the treatment plan and failure to correct the conditions leading to the deprivation adjudication. Mother appeals.

STANDARD OF REVIEW
¶ 7 In at least three cases, the appeals Court has defined the function of the appellate review as a thorough review of the record in light of the elements to be proven and to affirm the trial court if it is not contrary to the weight of the evidence. In re T.H.L., 1981 OK 103, ¶ 7, 636 P.2d 330, 333; In re Christopher H., 1978 OK 50, ¶ 19, 577 P.2d 1292, 1293; In re C.T., C.T. and A.T., 1999 OK CIV APP 55, ¶ 6, 983 P.2d 523, 525. On the other hand, Oklahoma jurisprudence has long been committed to the principle that jury verdicts will be upheld if supported by competent evidence. See In re T.R.W., 1985 OK 99, 722 P.2d 1197, (an adjudication of deprivation by a jury, citing Hames v. Anderson, 1977 OK 191, 571 P.2d 831, a tort case); see also, In re M.B., C.B. and T.B., 2000 OK CIV APP 56, 6 P.3d 1072, (where the evidence was not only clear and convincing but also substantially undisputed), and, In re C.C., 1995 OK CIV APP 127, 907 P.2d 241, (a parental termination case decided by a jury, citing Doyle v. Kelly, 1990 OK 119, 801 P.2d 717, a contract dispute case). Language in this latter line of authority indicates that if there is any competent evidence, including the reasonable inferences from the evidence before the trier of fact, tending to support the verdict, then the judgment will not be disturbed on appeal.[5]In re T.R.W., 1985 OK 99 at ¶ 13, 722 P.2d at 1200; In re J.M., 1993 OK CIV APP 121, ¶ 5, 858 P.2d 118, 120-21. Initially, these lines of authority suggest a conflict in the standard of review.
¶ 8 This Court, after review of cases, concludes that there is no conflict and that the decision to terminate parental rights must pass muster under the more stringent test where this Court reviews the weight of the evidence to support the decision to terminate.[6] Moreover, the very nature of the matter demands the application of the stricter standard of review. As stated by the Oklahoma Supreme Court:
The interest of children in a wholesome environment has a constitutional dimension no less compelling than that the parents have in the preservation of family integrity. In the hierarchy of constitutionally protected values both
interests rank as fundamental and must hence be shielded with equal vigor and solicitude.
In re T.H.L., 1981 OK 103 at ¶ 3, 636 P.2d at 334.
¶ 9 The strict standard of review follows from the reasoning of the Court in Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). There the Court decided that Due Process of Law required that the state be held to a "clear and convincing *1008 evidence" burden of proof in parental termination cases.[7] Thus, it is readily seen that a termination of parental rights action necessarily involves the fundamental liberty interest of natural parents in the care, custody, and management of their child and protection of the family unit. Santosky, 455 U.S. at 754-55, 102 S.Ct. at 1394-95. Such proceedings must be conducted using this more stringent standard of review.
¶ 10 The Court examined and characterized the nature of the proceedings to reach its conclusion in light of the factors set out in Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). They are: private interests affected by the proceeding; the risk of error created by the State's chosen procedure; and the countervailing governmental interest to support use of the challenged procedure. The Court's examination of the proceeding led it to conclude, as to all of the Eldridge factors, that Due Process demanded a strict burden of proof. The Court observed that the fact-finding process pitted the State against the parents with the parents alleged to be at fault and unfit so that the ultimate result, if in the State's favor, was a permanent severance of a fundamental and constitutionally protected parent-child relationship.
¶ 11 The Santosky Court noted that appellate review is not a "curative for an inadequate burden of proof." Santosky, 455 U.S. at 757 n. 9, 102 S.Ct. at 1396 n. 9. A logical extension of this point means that an appellate review utilizing a standard less strict than demanded under the circumstances, may not conclude that reversible error has occurred, even though the conclusion would be to the contrary under a stricter standard of review. Such a risk in dealing with a constitutionally protected entity cannot be allowed.
¶ 12 Moreover, here the more stringent standard of review is also triggered by the fact that the State shifted its position from an original action of a mental health matter to one involving a failure to correct a condition, after the cause began and had proceeded well into the process.[8] The matter began when Mother became mentally ill and proceeded to an adjudication of deprivation of the child on that basis until the first, and then amended, petition to terminate her parental rights was filed utilizing a ground for termination only incidently related to the reason for the original adjudication.[9] Extended foster care, the State's second ground for termination, also arose as a consequence of and out of Mother's original mental health problems.
¶ 13 Therefore, the standard of review here requires this Court to conduct a thorough review of the record in light of the elements to be proven. This Court, in conformity with this standard, has examined the evidence to ascertain whether it is competent, that is, whether all of the evidence for or all of the evidence against a requirement is relevant and material to the issue.[10] In a parental termination case, the State has the burden of proof to show by clear and convincing evidence that grounds exist for termination. In re C.G., 1981 OK 131, ¶ 17, 637 P.2d 66, 71. This Court also examined the competent evidence for and against the requirements using a "clear and convincing" standard in order to ascertain whether the State has met its burden.[11]
*1009 ¶ 14 In addition, Mother has challenged legal rulings made by the trial court. A pivotal issue here involves the selection of the correct ground by the State to pursue termination under the facts of the case. The appellate court has the plenary, independent and nondeferential authority to reexamine a trial court's legal rulings. Neil Acquisition, L.L.C. v. Wingrod Investment Corp., 1996 OK 125, 932 P.2d 1100 n. 1.

ANALYSIS AND REVIEW

Subsection 13 vis-á-vis Subsection 5
¶ 15 Mother maintains that the State should have proceeded solely on allegations under subsection 13. Thus, Mother argues that the petition was insufficient as notice and that the jury instructions were broader than necessary because they included subsection 5 as a ground for termination of her parental rights. Mother concludes by asserting that subsection 13 is a special and specific statute and thus controls over any broader, or general, provisions pertaining to termination.
¶ 16 This Court holds that the trial court erred by instructing the jury on subsection 5. There are two reasons for this ruling. First, the uncorrected "condition" referenced in subsection 5 necessarily means a condition the nature of which is subject to correction by the parent's efforts. It is well recognized that mental illness is a condition entirely distinct from other conditions leading to a deprived child status and may be caused by a number of factors, including organic deficiencies, not the fault of the person. Second, subsection 13 does qualify as a special statutory provision that prevails over the more general provision of subsection 5.
¶ 17 The judgment of termination of Mother's parental rights reached below must be reversed because the nature of the "condition" existing here is such that it is not correctable solely through the efforts of Mother. It would be patently unfair, if not also a violation of Substantative Due Process, to permit termination of the parental relationship for failure to correct a condition which cannot be remedied by the parent without medical, psychiatric, and psychological intervention. Moreover, the evidence here shows that Mother's failures to take medications and her denials that she has a problem are manifestations of the illness rather than culpable recalcitrance on her part.
¶ 18 Thus, this Court holds that subsection 5 "conditions" are those which the parent has the ability to correct and which do not include a propensity to fail correction of the condition as a component of or manifestation of the "condition." Subsection 13, as a special provision, deals with a different form of condition, one requiring medical, psychiatric, and psychological intervention, or a combination thereof, because the condition is essentially outside the control of the parent. Moreover, subsection 13 contemplates a person's inability to correct the condition because of language dealing with contingencies where the condition does not respond to treatment through no overt fault of the person and medical opinion concludes that the condition will not substantially improve. See In re R.S., 2002 OK CIV APP 90, 56 P.3d 381, where the Court drew the distinction between correctable "conditions" and a mental health "condition" as defined by statute. The facts of R.S. revealed that the parent had problems but those problems were not of the sort defined as a mental illness in the statute. Id., 2002 OK CIV APP at ¶ 13, 56 P.3d at 383. Therefore, the State could proceed under the "failure to correct conditions" criterion.
¶ 19 The parties here agree that Mother suffers from mental illness of the nature contemplated by subsection 13. Her initial court commitment admission to mental health treatment at Western State Psychiatric Center (WSPC) occurred when she exhibited bizarre behavior and hallucinations. Her initial diagnosis was Substance Induced Psychotic Disorder With Hallucinations and Delusions and possible paranoid schizophrenia.[12] Psychological testing then concluded that Mother presented symptoms of delusional disorder. She was found to be "disconnected from reality" and so far into her *1010 illness that she did not realize that she was in denial about her substance abuses.[13]
¶ 20 However, at trial, the treating psychiatrist could not say that her symptoms were drug induced. He stated that the present diagnosis was paranoia schizophrenia and that it was manageable through treatment but did not state the form or intensity of treatment required.[14] The psychiatrist also testified that denial of problems and failure to take medication are manifestations of the mental illness.[15]
¶ 21 Here, the "condition" is mental illness. Mental illness was the basis for the deprived child adjudication and remained as Mother's problem to the time of trial. This is the condition that must be corrected. In addition, the overwhelming evidence here shows that the alleged failure to correct the condition follows and flows directly from the condition itself.
¶ 22 The temptation to ask a rhetorical question is here likewise overwhelming: How is it possible in the State of Oklahoma that a governmental agency could seek to terminate a fundamental, constitutionally-protected relationship for failure to correct a mental condition when such failure is part of the mental condition itself? The answer is, of course, that it is not possible. The reason it is not possible is that Substantative Due Process of Law, separately from procedural safeguards, imposes the requirement that all government actions not be arbitrary; that the actions have a fair and reasonable impact on the life, liberty, and property of the person affected; and, that the means selected shall have a reasonable and substantial relation to the objective being sought. City of Edmond v. Wakefield, 1975 OK 96, ¶ 6, 537 P.2d 1211, 1213; Williams v. State ex rel. Dept. of Public Safety, 1990 OK CIV APP 27, ¶ 14, 791 P.2d 120, 124. Under this Court's construction, the statute does not violate this proscription.
¶ 23 This case began and was handled initially as a mental health problem and remained so through trial. However, sometime after the initiation of the case, the State then filed its initial petition, and then an amended one, seeking termination based upon subsection 5, failure to correct the condition leading to the deprived child adjudication without consideration of the Mother's inability to correct her mental condition. The reason for this action to separate the Mother and child by termination is not a part of the record. However, the State concedes that a case for termination cannot be made on subsection 13 grounds of failure to respond to treatment, or mental illness that will not substantially improve after treatment. Moreover, subsection 5 is not available under the facts of this case.
¶ 24 Mother then concludes by correctly arguing that subsection 13 is a special provision and specific statute and thus controls over any broader, or general, provisions pertaining to termination governing the facts here.[16]In re L.S., 1990 OK CIV APP 94, ¶ 21, 805 P.2d 120, 125. The State disclaims subsection 13 by its argument that a case under that subsection could not be proven, but this misses the point.[17]
¶ 25 The statutes did not address mental health as it related to parental rights and children prior to 1987, when subsection 13 was enacted.[18] 1987 Okla. Sess. Laws c. 95, § 1; In re L.S., 1990 OK CIV APP 94 at ¶ 18, 805 P.2d at 124. The enactment of *1011 subsection 5 did not add to subsection 13, but rather added a new subsection and specially provided for certain, defined mental health conditions. After addition of subsection 5 and other subsections not relevant here, the entire statutory section was reenacted.
¶ 26 Consideration must be given to the statute as a whole without isolating words, phrases, or other parts. McNeill v. City of Tulsa, 1998 OK 2, ¶ 11, 953 P.2d 329, 332. Statutes are given a construction which is reasonable and which does not led to internal inconsistencies. Lancaster v. State ex rel. Harrod, 1967 OK 84, ¶ 6, 426 P.2d 714, 716. In this instance, it is possible that subsection 5 and subsection 13 each might come into play where a child has been adjudicated as a deprived child. Moreover, the "condition" leading to deprivation in a given case may be, as here, a defined mental condition, or, as in other cases some other cause, such as abuse or neglect.
¶ 27 Before a statute may be termed "specific" it must clearly include the subject of the general statute and provide a different rule, that is, they must be in conflict as to the identical subject matter. Tulsa County Deputy v. Board of County Commissioners, 1998 OK 44, ¶ 13, 959 P.2d 979, 981; City of Tulsa v. Smittle, 1985 OK 37, ¶ 17, 702 P.2d 367, 371.
¶ 28 The case of Carter v. City of Oklahoma City, 1993 OK 134, 862 P.2d 77, provides an example of the "clearly included" requirement. Carter brought an inverse condemnation suit and prevailed. Carter demanded a jury trial after the commissioners appraised the property, but the jury awarded an amount lower than the commissioners' assessment. Carter requested and obtained attorney fees under 27 O.S.1991, § 12. The trial court ruled that Section 12 controlled over 66 O.S.1991, § 55, in inverse condemnation cases and the Supreme Court affirmed.
¶ 29 On appeal, the City argued without success that the condemnation statute in Title 66 applied, together with its proviso that the landowner had to prevail by more than ten percent over the commissioners' award. The City's argument pointed out that the statutes contained similar wording. However, the Supreme Court rejected the argument, noting that provisions in Title 66 and other statutes leading to utilization of Title 66, referred to condemnors instituting a condemnation action and not to inverse condemnation matters. Thus, because Section 12 clearly included the attorney fee subject matter, inverse condemnation, it controlled over the general condemnation statute.
¶ 30 Here, Section 7006-1.1 begins with the provision that "a court may terminate the rights of a parent to a child in the following situations" and then lists the fifteen instances where findings may result in termination when a child has been determined to be deprived. The Legislature singled out the mental health "condition" for special treatment in subsection 13, and has thereby created a special provision controlling over the more general provision of subsection 5. Both subsections deal with the same subject-mattertermination of parental rights involving children who are deprived. However, subsection 13 deals with a special situation and condition.
¶ 31 A well-settled rule of statutory construction provides that where a matter is addressed by two statutes, one specific and one general, the specific statute controls. Hall v. Globe Life and Acc. Ins. Co. of Okla., 1999 OK 89, 998 P.2d 603. This Court finds no legal distinction between a case where the issue arises as between two discrete statutes and a case, as here, where the issue arises as to subsections within a single statutory section. Thus, under the facts here it was error to allow the State to proceed under subsection 5 and to instruct the jury on that ground.

Subsection 13 vis-á-vis Subsection 15
¶ 32 Subsection 15 antedates subsection 13, as it came into the statute in 1998. 1998 Okla. Sess. Laws, c. 414 § 20.[19] On its face, subsection 15 does not appear to require some form of act, or default of performance, *1012 in order to be utilized. However, the wording of the subsection discloses that, unlike the special provisions of Section 7006-1.6, the use of subsection 15 does not create a mandatory requirement for termination. In re T.M., 2000 OK CIV APP 65, ¶ 15, 6 P.3d 1087, 1093. This means that extended foster care per se does not create a stand alone basis for termination of parental rights.
¶ 33 Thus, a parent facing termination on subsection 15 grounds is, nevertheless, entitled to receive all constitutional and procedural rights and to present all defenses available. In re M.C., 1999 OK CIV APP 128, 993 P.2d 137. Included within the parent's rights is the right to defend the consequences of a failure to correct a condition. See In re M.J. & J.J., 2000 OK CIV APP 75, ¶¶ 11-12, 8 P.3d 936, 939. In the context of extended foster care, the evidence must also show that the parent bears the culpable responsibility for the fact that the child has been in foster care for the requisite period and that the parent is not the subject of an uncorrected condition which is by its nature beyond the parent's power to correct.
¶ 34 Failure to allow for examination of the conditions causing the child to be placed in foster care for an extended period could lead to absurd results. Posit a young married couple with a small child and no other family or relatives. Father is inducted into military service and is taken prisoner during combat. Mother dies from illness or accident, leaving the child without parental care. The child would properly be placed in foster care, but if Father's "condition" of captivity extended beyond twenty-two months, and fifteen of those months included foster care, then his parental rights could be terminated simply because of the extended foster care but for a rational interpretation of the statute requiring examination of the underlying reason, or reasons, for instituting foster care. Such termination would not pass constitutional muster, as should not those of the nature here reviewed.
¶ 35 The Court, when construing a statute, will presume that the Legislature did not intend an absurd or wholly unreasonable result. Therefore, the Court's construction of a statute avoids such result whenever such construction will not violate legislative intent. In re Bonny Dawn Edwards Irrevocable Trust, 1998 OK CIV APP 144, ¶ 13, 966 P.2d 810, 814.
¶ 36 Therefore, the judgment of the trial court is reversed and the cause is remanded for a new trial in accordance with this Opinion.
¶ 37 REVERSED AND REMANDED FOR A NEW TRIAL.
COLBERT, P.J., concurs, and GOODMAN, J., concurs in result.
GOODMAN, J., concurring in result.
¶ 1 The issue of the appellate standard of review was established by the Oklahoma Supreme Court in In re S.B.C, 2002 OK 83, 64 P.3d 1080 (2002), wherein the court stated that "appellate review of parental-status-termination decisions must be based upon the clear-and-convincing evidence standard." Id., 2002 OK 83 at ¶ 4, 64 P.3d at 1081. The Oklahoma Supreme Court remanded S.B.C. to this court "for that court's reconsideration by applying the standard of review standard consistent with today's pronouncement...."a directive with which this court has since complied. Id., 2002 OK 83, ¶ 8, 64 P.3d at 1082. The standard of review mandated by S.B.C. has been recognized and applied by other divisions of the Oklahoma Court of Civil Appeals. See, e.g., In re C.R., 2003 OK CIV APP 14, 63 P.3d 573; In re J.K., 2003 OK CIV APP 2, ___ P.3d ___; In re T.M., 2003 OK CIV APP 1, ___ P.3d ___. Therefore, I do not see the benefit of this court engaging in a lengthy analysis of a legal principle already articulated by the Oklahoma Supreme Court and implemented by the Oklahoma Court of Civil Appeals.
¶ 2 In any event, because an error of law of fundamental magnitude occurred below, I do not believe that the standard of appellate review is implicated. I would follow the analysis established in In re B.T.N., No. 96,960 (OK CIV APP Div. II, May 21, 2002), wherein we stated:
In In re L.S., 1990 OK CIV APP 94, 805 P.2d 120, this court held that when the legislature enacted (A)(13) and its predecessor *1013 statute, it did so to afford additional due process protections to persons who were mentally ill or impaired. We held that compliance with any treatment plan or other requirement imposed upon such a parent must be viewed in light of that parent's mental disability and that parent's ability to comprehend the requirements placed upon her. In effect, the legislature enacted additional safeguards to ensure that parental rights were not terminated solely because a parent was mentally ill, but only in those cases where a causal link between the untreated illness and harm to the child could be shown. In this case the record is replete with medical records and test results which clearly show that Mother suffers from a variety of treatable mental illnesses. While most of these seem to be controlled by medication, nevertheless we must hold that fundamental error occurred when the trial court refused to instruct the jury on the issue of Mother's mental health.
....
We hold that State should have proceeded under (A)(13) because Mother's history of mental instability is well documented. Indeed, it is the unstable nature of Mother's mental condition that led to Child being placed in foster care in the first instance, and ultimately led to the determination that Child was deprived in the second instance. In many respects, under the facts of this case, the grounds for termination pled by State, i.e. (A)(5) and (A)(15), would not exist but for the mental instability of Mother. Such mental instability may serve as a basis for termination, if it presents harm to Child, as addressed in (A)(13). Mother attempted to obtain an instruction to the jury to that effect, but said motion was denied. Fundamental error thus occurred.
I would limit our review to that core issue, and simply hold that the trial court committed a fundamental error of law in refusing to instruct the jury pursuant to (A)(13).
NOTES
[1] District Court Record, p. 20. A separate mental health case also involved Mother.
[2] See n. 9.
[3] The statutes have since been amended. Subsections 5, 13, and 15, in effect for this proceeding, read:

A. Pursuant to the provisions of the Oklahoma Children's Code, the finding that a child is delinquent, in need of supervision or deprived shall not deprive the parents of the child of their parental rights, but a court may terminate the rights of a parent to a child in the following situations. The paramount consideration in proceedings concerning termination of parental rights shall be the health, safety and best interests of the child:
....
5. A finding that:
a. the child has been adjudicated to be deprived, and
b. such condition is caused by or contributed to by acts or omissions of the parent, and
c. termination of parental rights is in the best interests of the child, and
d. the parent has failed to show that the condition which led to the adjudication of a child deprived has been corrected although the parent has been given not less than the time specified by Section ....
....
13. A finding that all of the following exist:
a. the child has been adjudicated deprived, and
b. custody of the child has been placed outside the home of a natural or adoptive parent, guardian or extended family member, and
c. the parent whose rights are sought to be terminated has a mental illness or mental deficiency, as defined by Section 6-201 of Title 43A of the Oklahoma Statutes, which renders the parent incapable of adequately and appropriately exercising parental rights, duties and responsibilities, and
d. the continuation of parental rights would result in harm or threatened harm to the child, and
e. the mental illness or mental deficiency of the parent is such that it will not respond to treatment, therapy or medication and, based upon competent medical opinion, the condition will not substantially improve, and
f. termination of parental rights is in the best interests of the child.
Provided, a finding that a parent has a mental illness or mental deficiency shall not in and of itself deprive the parent of his or her parental rights.
....
15. A child has been placed in foster care by the Department of Human Services for fifteen (15) of the most recent twenty-two (22) months. For purposes of this paragraph, a child shall be considered to have entered foster care on the earlier of:
a. the adjudication date, or
b. the date that is sixty (60) days after the date on which the child is removed from the home.
[4] Mother duly preserved objections to the instructions. 12 O.S.2001, § 578; Trial Tr. Vol. II, pp. 438-39.
[5] Competent evidence has been defined by the Oklahoma Supreme Court as that which is relevant and material to the issue to be determined. Joseph A. Coy Co. v. Younger, 1943 OK 160, 136 P.2d 890, 891-92. Evidence remains "competent" under this definition even though it may be conflicting, contradictory, or lack a degree of credibility. Id. at 892; Cox v. B.F. Goodrich Co., 1989 OK CIV APP 41, ¶ 7, 788 P.2d 967, 968.
[6] First, in all of the cases not involving purely questions of law, the appellate court did in fact review the evidence for sufficiency rather than mere existence of competent evidence. An example is In re T.R.W., 1985 OK 99 at ¶ 17, 722 P.2d at 1201, where the Court, after examination of the evidence, including its various interpretations, found it to be sufficient to support the verdict. Similarly, the Court in In re J.M., S.F. and J.A., 1998 OK CIV APP 141, ¶ 4, 964 P.2d 972, 973, also reviewed the evidence to find that it clearly supported the outcome. Second, the dissenting Opinions in In re T.H.L. and in In re Christopher H. argued for review based upon whether the State met its burden by "clear and convincing evidence." Thus, the Court in each case was unanimous on the point that the appellate court would weigh the evidence but disagreed as to the criterion involved.
[7] The Court was reviewing New York's scheme, but the characterizations have universal application.
[8] The State explains, as stated in its Brief, that it could not prove a case under subsection 13 because Mother's condition could improve with treatment.
[9] In addition, this petition, even as amended, lacks clarity as well as allegations concerning the Indian Child Welfare Acts and the Uniform Child Welfare Act. An example of the former is found in paragraph 2 where the allegations read grammatically that the child has failed to do those things required of the parent. In addition, the language "termination is being sought under 10 O.S. 7006-1.1 et seq.," leaves open which of the statutes' subsections the State intends to proceed under.
[10] See n. 4.
[11] This conclusion conforms to the Oklahoma Supreme Court's decision in In re S.B.C., 2002 OK 83, 64 P.3d 1080, which has not been released for publication in the present case reports. It is thus subject to revision or withdrawal.
[12] State's Trial Ex. 4.
[13] Id. at 33-34. Moreover, an in depth evaluation of this observation would assist in explaining why Mother was remiss in taking medication and attendance at AA meetings.
[14] Transcript, pp. 364, 370-71.
[15] Id. at 371.
[16] Ordinarily the "specific" versus the "general" issue arises when comparing two different statutes. Some courts have addressed the issue when the issue arises within a statute. See County Bd. of Ed. of Daviess Co. v. Fiscal Court of Daviess Co., 221 Ky. 106, 298 S.W. 185 (1927). Here, the issue is presented as a conflict between subsections.
[17] Thus, the State says that subsection 13(e)'s requirement that competent medical evidence show that the mental condition will not substantially improve could not be proven, mainly because the evidence is to the contrary. Yet, this is the very condition used by the State and DHS to initiate these proceedings.
[18] The section of the statute containing subsection 5 has since been renumbered.
[19] Also in 1998, the Legislature enacted special provisions regarding children in extended period foster care up to November 1997 and provided for expedited termination of parental rights as to that class of children. 1998 Okla. Sess. Laws, c. 421 § 31; 10 O.S.2001, § 7006-1.6.