2012 OK CIV APP 104

**In the Matter of B.W., R.W., T.W. and A.W., Alleged Deprived Children.**

**Latashia Garrion, Appellant,**

v.

**State of Oklahoma, Appellee.**

**No. 110,189.**

Court of Civil Appeals of Oklahoma, Division No. 2.

Oct. 26, 2012.

---

**8.** Statutory construction presents a question of law that we review *de novo*. *Humphries v. Lewis*, 2003 OK 12, ¶ 3, 67 P.3d 333, 335.

Kristie D. Scivally, Oklahoma City, Oklahoma, for Appellant.

David W. Prater, District Attorney, Jane A. Brown, Assistant District Attorney, Oklahoma City, Oklahoma, for Appellee.

DEBORAH B. BARNES, Presiding Judge.

¶1 Appellant Latashia Garrion (Mother) appeals from the district court's order (Order) terminating her parental rights in B.W., R.W., T.W., and A.W. (the Children), and adopting Mother's signed Request to Consent to Termination of Parental Rights (the relinquishment) pursuant to a settlement agreement with Appellee State of Oklahoma (State). The issue on appeal is whether the district court erred in terminating Mother's parental rights by incorporating into its Order the terms of the relinquishment pursuant to a settlement agreement among the parties. Based on our review of the applicable law and record on appeal, we reverse and remand the district court's Order terminating Mother's parental rights under the terms of the settlement agreement.

## FACTS AND PROCEDURAL BACKGROUND

¶2 Mother and Father are married by common law and are the biological parents of all four minor children in the present action.[1] The present action began after a doctor filed a report with the Department of Human Services (DHS) alleging that B.W. and R.W. were victims of physical abuse. Subsequently, DHS confirmed Father was physically abusive to the two children named and continued to pose a threat of harm towards all of the minor children because of his alcohol abuse.[2]

¶3 In November of 2008, State filed a petition seeking adjudication of B.W., R.W., and T.W. as deprived children.[3] The petition included allegations of physical abuse by Father and a failure by Mother to protect the Children from physical abuse and "to protect [them] from ... Father's substance abuse."[4] An emergency custody hearing was held on November 12, 2008, and the district court ordered the Children into the protective custody of DHS.[5] Mother and Father were each appointed an attorney.[6]

¶4 Mother and Father stipulated to the allegations in the deprived petition on March 30, 2009.[7] On the same day, an Individualized Service Plan (ISP) was adopted and signed by both parents to serve as a guide in correcting the conditions that led to the Children being adjudicated deprived.[8] A fourth child, A.W., was born on June 2, 2009, and taken into emergency custody shortly after birth.[9] On June 15, 2009, State filed an amended petition to include A.W. as a deprived child along with the other three siblings.[10] On September 1, 2009, Mother and Father stipulated to the amended petition and all four minor children were adjudicated deprived.[11] The ISPs previously adopted by the district court remained the same after A.W. was adjudicated deprived.

¶5 The ISP for Mother and Father listed four conditions to be corrected: (1) physical abuse; (2) threat of harm; (3) failure to

---

1. Tr., November 2011 Hearing, p. 18. A previous child welfare case involving this family (Case No. JD–04–681) was dismissed in March of 2008, eight months before the present action was begun. *Id.* The Children returned to the parents' home after the case was dismissed in March 2008 and lived there until DHS took them into protective custody in November 2008.

2. R., pp. 17 & 59.

3. R., pp. 1–2.

4. R., p. 2.

5. R., p. 3.

6. R., p. 3. Although the attorney was initially appointed to represent just one parent in the deprived adjudication, she ultimately represented both Mother and Father at the settlement conference and the hearings thereafter.

7. R., p. 71.

8. R., pp. 59–65.

9. R., p. 72.

10. R., pp. 75–76.

11. R., p. 99.

protect; and (4) substance abuse.[12] Individually, Mother was required, among other things,[13] to: (1) attend and actively participate in a parenting skills class; (2) submit to random urinalysis (UA testing); (3) participate in an alcoholics anonymous program (Al–Anon); (4) participate in family counseling with the Children; and (5) provide proper parental care and guardianship for the Children's physical and mental well-being.[14] Mother was also required "[a]fter reunification ... [to] provide a clean, safe, and stable home with working utilities. The home will be free from alcohol, drugs, and criminal activity."[15]

¶ 6 The July 6, 2009 ISP progress report indicates little progress was made by Father in correcting the deprived conditions. Father had been jailed for approximately three weeks and was unable to fulfill his service plan.[16] Mother, however, had begun to attend Al–Anon meetings and finished her Parenting Skills workshop, though she was not yet discharged because she had to complete the Parent Child Observation (PCO), which was scheduled for July 7th. She had not yet begun substance abuse testing though she "tested negative at Show Cause for [A.W.]"[17] As to "**Risk Factor:** Failure to Protect," the report stated that Mother has not "provided proper parental care and guardianship for" the Children. However, as to "**Risk Factor:** Child Well Being—Physical," the report noted Mother "visited [T.W.] in the hospital and attended [A.W.'s] cardiology appointment."[18] Though she had not yet begun family counseling, Mother's progress report stated that

she visited the Children every two weeks, signed the needed releases, stayed in contact with her case worker, was working on her service plan and attended all court dates. As to child support, the report stated that Mother "is not working."

¶ 7 The July 8, 2009 report from the agency providing parenting services to Mother reported that Mother "actively participated in group discussions, completed homework and was able to share examples" in her parenting skills class and "was working to grasp the concepts that were being presented each week."[19] The agency also reported that Mother had successfully completed her compassion workshop. The therapist reported that Mother "was attentive, actively participated in group discussions, and was able to verbalize examples of how to implement the material," and reported that Mother's "homework was usually in-depth and insightful, demonstrating understanding." In addition to recommending that Mother and the Children engage in two or more PCOs, the agency also recommended that, upon reunification, Community Home–Based Services (CHBS) be in the home.

¶ 8 The September 1, 2009 progress report stated that Father had missed a scheduled drug test, diluted a different test sample, and tested positive for alcohol at another test.[20] As to Mother, her progress report noted she had not yet started substance abuse treatment, though she was attending Al–Anon meetings and completed parenting skills, compassion workshop, and PCOs.[21] The re-

12. R., p. 59.

13. Mother was also required to: visit the Children as ordered by the court; sign releases to share information about her case with people and agencies providing services to allow her to complete her plan; contact her case worker at least once a month to inform the worker about her progress on her plan and to provide proof of completion of her plan as well as report any changes in her address, job, or people with whom she lived; attend, participate and complete the requirements of all services of her plan, and to follow all professional recommendations; attend and participate in any scheduled permanency hearings and planning reviews; and pay child support as ordered by the court. R., p. 61.

14. R., p. 62.

15. R., pp. 62–63. Father was required to engage in the same ISP guidelines as Mother, as well as, attend a compassion workshop for anger management and participate in substance abuse counseling/treatment. R., pp. 60–61.

16. R., p. 82.

17. R., p. 90.

18. R., pp. 90–91.

19. R., p. 94.

20. R., pp. 100–102 & 114–116.

21. The agency servicing the PCOs reported that the sessions were very good. The agency report

port stated that the failure to protect risk factor is inapplicable because the Children do not live with Mother. Under the risk factor for "Child Well Being—Physical," the report noted that Mother "goes to many of the [C]hildren's doctor appointments and inquires about their health." [22] The ISP progress report stated that family counseling had not yet begun, but noted further that Mother visited the Children at the DHS office one to two times per month, signed all releases, was in contact with her case worker, and had attended all court hearings. She was, however, not paying child support and was in arrears on her payments.

¶ 9 The December 4, 2009 progress report showed that Father had missed two scheduled UA tests and Mother had missed one, but she tested negative for the preceding six random drug tests.[23] The report stated that based on a home assessment conducted on October 22, 2009, Mother and Father needed to do the following to their home before the Children move in: "1) get car seats 2) get a light in [B.W. and R.W.'S] room 3) get a smoke detector . . . 4) show shot record for pet 5) finish the shower area where pipes are exposed 6) put outlet covers up 7) get tag and insurance for vehicle." As with prior progress reports, Mother was reported to regularly visit with the Children twice per month—then supervised in her home—to make inquiries about the Children's health, to have signed all releases, and to have been in contact with her case worker. She was reported to have been participating in random UA testing and attending all court sessions, but she was in arrears on child support.

¶ 10 On December 8, 2009, Mother and Father participated in a DHS Family Group Decision Making Conference that was conducted "to discuss case progress and to create a concurrent plan in the event that parental rights are terminated." [24] The case worker advised Mother and Father that the case was set for pre-trial termination and that the following services—with respect to Mother—had to be completed "in order for reunification to be possible:" Mother will provide DHS and the court with random UA testing results. Mother explained that she had not begun testing because of financial reasons, though she had been attending and documenting her attendance at Al–Anon meetings. In the event of termination, Mother and Father indicated a preference for the Children to be placed within the family and named two sets of cousins as possible placements.

¶ 11 The March 12, 2010 progress report showed substantial setbacks as Father had tested positive for alcohol five times and missed another test since the last progress report.[25] Mother missed three UA tests during that same period, but she explained her absence was strictly as a result of financial constraints. However, the report stated that Mother and Father now resided in a three bedroom house to which Father had made many repairs and upgrades.[26] Father was employed for contracting work in various locations though he was under a budgetary strain: his employer did not want Father to be out of the state because of the Children's health concerns and Father's need for random UA testing. Mother was described as unemployed and a stay-at-home homemaker. Both reported they were "down" because of the Children's health issues and financial strain.[27] Mother was described as currently participating in UA testing and as having completed the Al–Anon and Parenting Skills programs.

¶ 12 As to the two risk factors of "Failure to Protect" and "Child Well Being–Physical,"

___

stated that Mother was attentive to the needs of the Children and was affectionate toward them. She set limits as needed and took opportunities to praise and teach the Children. She was active and enthusiastic in play. The Children responded well to Mother "and were very comfortable in play and in conversation. No concerns were noted by the therapist." R., p. 133.

22. R., p. 111.

23. R., p. 138.

24. R., p. 172.

25. R., p. 176.

26. R., p. 176.

27. R., p. 177.

the report noted that the Children are not living with Mother, but that when the Children are in the hospital, Mother is "a constant presence."[28] Family Counseling had not yet begun, but a referral had been made. As with prior reports, Mother had monthly visits with the Children in her home under the supervision of DHS, signed all releases, was in contact with her case worker, and was "in progress" for attending and completing her service plan and court appearances. She continued to be in arrears in child support.

¶ 13 A permanency review hearing was held on March 11, 2010. The order was filed March 12th and noted that reunification was still the permanency plan and that reunification may occur when all services were completed. It further noted that "alcohol/substance issue[ ] is the remaining issue."[29]

¶ 14 The May 7, 2010 progress report noted that Mother and Father were being evicted because the landlord sold the home; however, they had applied for and received Section–8 housing. Mother had begun housekeeping and odd-jobs work and Father started his own business doing the work in which he had previously been employed. The record does not reveal Mother's report, but the May 7th permanency/review order notes that "[Mother] complete on services— needs to continue testing."[30] Reunification was still noted as the permanency plan.

¶ 15 The final progress report was August 6, 2010. The recommendation made was a request for "termination of the parental rights of [Father] and [Mother] as to [the Children] [because of the] failure to Correct the conditions of substance abuse by [F]ather."[31] The report stated that Mother and Father suffered a "severe financial setback" resulting from hail damage to the roof of their home that resulted in the loss of all of their furniture and from the theft from Father's trailer of the tools and equipment he used in his business. During this time, one of Father's siblings passed away. Father sought inpatient care. Father had tested positive for alcohol in May, had missed three UA tests, and had been dismissed from his program.[32] Mother missed scheduled UA testing and was also dismissed from her service plan, but was scheduled to begin testing with a different service provider.[33]

¶ 16 On August 12, 2010, State filed a second amended petition asking the district court to terminate the parents' parental rights because Mother and Father failed to correct the conditions that led to the Children being adjudicated deprived and because they were given at least three months to correct the conditions pursuant to 10A O.S. 2011 § 1–4–904(B)(5).[34] Specifically as to Mother, the State alleged that the Children were adjudged deprived because of the following conditions:

That the [C]hildren have not had the proper parental care and guardianship necessary for their physical and mental well being;

That the [C]hildren have disclosed physical abuse in the home which resulted in injuries to the [C]hildren;

That a CHO–25 was filed in regards [sic] to the injuries to the [C]hildren;

That [Mother] lives in the home with [Father] and should have known about the abuse;

That [Mother] has failed to protect the [C]hildren from physical abuse and [Father's] substance abuse;

---

28. R., p. 184.

29. R., p. 188.

30. R., p. 201.

31. R., p. 205.

32. R., p. 206.

33. R., pp. 206 & 210.

34. R., pp. 214–15. Section 1–4–904(B)(5) provides,

B. The court may terminate the rights of a parent to a child based upon the following legal grounds:
. . . .
5. A finding that:
 a. the parent has failed to correct the condition which led to the deprived adjudication of the child, and
 b. the parent has been given at least three (3) months to correct the condition. . . .

That [A.W.] was adjudicated Deprived as to [Mother] on August 31[,] 2009 pursuant to the following conditions;

...;

That the home of [M]other is unfit due to physical abuse, [Mother's] failure to protect and [Father's] substance abuse;

That [Mother] has not corrected the conditions that led to the adjudication of the siblings.... [35]

¶ 17 In the permanency review orders for September 9, 2010, October 8, 2010, and December 16, 2010, the district court made findings that State had made reasonable efforts to prevent the need for removal of the Children from the parents' home.[36] Further, the district court found that continuation of the Children in the parents' home would be contrary to the Children's best interests.[37] The court set the termination proceeding for a jury trial to be held January 24, 2011.

¶ 18 During this period, ISP progress reports continued to be made. The October 8th report as to Mother stated that she "has [begun] testing and has tested negative, ... [and] has also completed all of her other services."[38] She had also begun Family Counseling services. The December 16, 2010 report stated Mother was not testing because of financial constraints—she was earning $30 per week and Father was unable to work because of a back injury for which he was awaiting surgery.[39]

¶ 19 The January 24, 2011 progress report again listed four conditions to be corrected: (1) physical abuse; (2) threat of harm; (3) failure to protect; and (4) substance abuse. It required under "Desired Result(s)" that Father cease physical abuse toward the Children, that Mother and Father demonstrate appropriate discipline, Father demonstrate that he is free from alcohol and illegal substances, that Mother and Father protect the Children from physical abuse and harm, and

that Mother "will protect the [C]hildren from substance abuse by" Father.[40] The DHS recommendations in the report were that the Children remain in DHS custody and in their current placements, that visitation remain the same and that the parents' parental rights be terminated. The termination recommendation was made as a result of "a past history of alcohol related incapacity or unwillingness to care for the [C]hildren, and repeated, unsuccessful efforts at treatment. [T]here is prior abuse or neglect of the [C]hildren with diligent but unsuccessful agency efforts to rehabilitate the parents."

¶ 20 Prior to the scheduled jury trial, Mother and Father, represented by their attorney, met in a settlement conference with State's attorney, the Children's attorney, a DHS worker, and a Court–Appointed–Special–Advocate (CASA) volunteer for the Children.[41] The parties negotiated a settlement agreement and presented it to the trial judge at the January hearing. The trial judge received testimony from the parties that set out the terms of their proposed agreement. Pursuant to the proposed settlement agreement, Mother and Father, in order to avoid a jury trial, each separately executed a relinquishment of parental rights.[42] In exchange for the relinquishment, State agreed that it would not proceed with a jury trial and the parents would have one final opportunity to correct the conditions before State would seek termination. State agreed that it would not file the relinquishments, however, unless Mother and Father continued to fail in making progress towards correcting the conditions.[43] In the event the parents could show that they had corrected the deprived conditions, or were making progress towards correction, then State agreed that it would not ask the district court to adopt the relinquishments and would destroy them.

35. R., p. 214.

36. R., pp. 217, 219 & 233.

37. R., p. 233.

38. R., p. 222.

39. R., p. 236.

40. R., p. 247.

41. Tr., January 25th Hearing, p. 6.

42. R., pp. 298–303.

43. Tr., January 25th Hearing, p. 9.

¶ 21 At the hearing, the trial judge received the following testimony from Mother and Father:

> THE COURT: [Mother] has ... your attorney[ ] discussed with you your rights as a parent in Oklahoma whenever the State asks to terminate your parental rights?
>
> [MOTHER]: Yes.
>
> THE COURT: And she has given me a form and I—this is not going to be put in the court file at this time. This is a document that was executed. And there's a signature that's on ... this document. Is that your signature?
>
> [MOTHER]: Yes.
>
> THE COURT: All Right. [Father], I'm holding up a second document that is two-page.... [T]here's a signature on this page as well. Is that your signature?
>
> [FATHER]: Yes, Your Honor.[44]

¶ 22 The court then asked the attorneys for the parents and for State to enumerate the "things that still need to be done" pursuant to the agreement of the parties. Mother's attorney said that Father was to continue with his drug and alcohol testing and his outpatient service drug treatment program. Mother and Father were to go to Parent Child Interaction Therapy [PCIT] and family counseling with the Children. Mother was to continue going to Al–Anon, but her drug testing was suspended because, according to State's attorney, "we determined that to be an expense that is not particularly necessary. She has never ever tested dirty."[45] The court asked the Children's attorney if there was "anything else that this is setting some conditions on?" to which the attorney replied, "No, Your Honor."[46]

¶ 23 Mother's attorney then made the following record as to "the relinquishments ... being filled [sic]. They're conditional in that [Mother and Father] have the opportunity, until our next court date, to make progress, as the Court has said. And upon a finding of that and—or the parties' agreement of that, then the relinquishments will not be entered and will be destroyed."[47] The court responded, "Okay," and continued its questioning of the parents, as follows:

> THE COURT: ... [Mother], do you understand the things that the Court has outlined that you have to do in order for these relinquishments not to go into place?
>
> [MOTHER]: Yes.
>
> THE COURT: And, [Father], do you understand the things that you have to do in order for these relinquishments not to go into place?
>
> [FATHER]: Yes, sir.
>
> THE COURT: And do both of you understand that if you want a jury trial now, a jury is available to hear your case; is that correct?
>
> [MOTHER]: Yes.
>
> [FATHER]: Yes.
>
> THE COURT: And do you understand that if you do not do these things, the Court is going to expect that these things will go—will take effect at the next court date; do you understand that?
>
> [MOTHER]: Yes.
>
> [FATHER]: Yes.[48]

¶ 24 The trial judge also asked Mother and Father if they were threatened or forced, to which they each replied, "No," and whether they read the forms and understood their rights, to which they replied, "Yes." The court then said the relinquishments "will not be filed in the court file at this time, but will be—remain as an exhibit to this transcript and will be entered into if the—if what they have—and will be entered at the next court date if their agreement has not been fulfilled."[49] On January 26, 2011, the trial court filed its order which stated that Mother and Father each "enter a conditional relinquishment, [which] are in the possession of the Court Reporter."[50] In the order, the

---

44. *Id.* at pp. 5–6.

45. *Id.* at p. 7.

46. *Id.* at p. 9.

47. *Id.*

48. *Id.* at pp. 9–10.

49. *Id.* at p. 11.

50. R., p. 257.

trial judge documented the terms of the agreement as follows:

[T]o avoid the relinquishments being adopted by the Court, the parents must[:]

Father must — enroll in and actively participate and complete an approved substance abuse program ·

— drug test regularly and without missed tests (including alcohol testing)

— begin and actively participate in good faith with PCIT therapy and family counseling with the Children

Mother must — actively participate in and regularly attend ALANON meetings

— begin and actively participate in good faith with PCIT therapy and family counseling with the [C]hildren

As well as comply and correct all conditions enumerated on the I.S.P. Mother allowed—by agreement of the parties—to stop drug testing.

¶ 25 The next permanency review hearing was set for May 5, 2011, but was later reset and held on May 26, 2011. The progress report filed May 23, 2011, reported that both parents were working full time though Father had a leave of absence to enable him to complete his inpatient treatment.[51] The court's order noted that Father was still receiving inpatient treatment and ordered PCO and PCIT visits before unsupervised visits would begin.[52]

¶ 26 As to Mother, the May progress report states that she had completed parenting skills, Al-Anon and drug testing conditions; that she visited the Children regularly, signed all releases, was in contact with her case worker regularly, and attended all court hearings; and that she was in progress in attending, participating and completing the requirements of all services on her plan. The report noted that Mother had been referred to family counseling but was awaiting that service pending a visitation change.

¶ 27 As was noted on prior progress reports, the report stated under the risk factors for "Failure to Protect" and "Child Well Being—Physical," that the Children do not reside with the Mother. While she was still in arrears on child support, the report stated that Mother was currently paying child support.

¶ 28 The next permanency/review hearing was held on September 8, 2011, and the court

referee made findings that reunification may only occur once the parents correct all required conditions and ordered that Mother and Father be allowed unsupervised visitation when appropriate.[53] The September ISP progress report for Mother was the same as the previous report except it noted that, although she had completed her Al-Anon program, Mother continued to attend meetings and she was "actively working her services."[54]

¶ 29 The last permanency/review hearing was held on November 10, 2011, at which time State moved for termination of Mother's and Father's parental rights pursuant to the terms of the settlement agreement ordered by the trial judge in January of 2011. The district court received testimony from Mother, Father, a DHS worker, and a CASA volunteer. The CASA volunteer testified that she smelled alcohol on Father at a meeting with her and the Children at Chuck-E-Cheese's.[55] She said she knew the smell because she once worked with an alcoholic when she was in college. She conceded on cross examination, however, the smell could have been something other than alcohol.[56]

¶ 30 The DHS worker testified that the non-compliance by "the parents" was with the "drug testing, not missing a drug test."[57] Upon further examination, he testified that it was Father who missed drug testing in Sep-

51. R., p. 261.

52. R., p. 273.

53. R., p. 278.

54. R., p. 291.

55. Tr., November 10th Hearing, p. 9.

56. *Id.* at p. 16.

57. *Id.* at p. 10.

tember and October,[58] and that the substance he abused was alcohol. He also testified that he was unaware Father had been participating in a substance abuse program with Mending Hearts until the morning of the hearing.[59] He said DHS had not approved the Mending Hearts program for Father.[60] The Mending Hearts report revealed that Father tested negative for drugs, including alcohol, in September and October.[61]

¶ 31 On the other hand, the DHS worker testified that Mother actively participated in Al–Anon and was scheduled for family counseling; however, that counseling had not yet started because of a change in the foster home of the three oldest children resulting in the appointment of a new therapist.[62] In answer to the court's inquiry, the DHS worker testified that Mother met all the conditions of her ISP.[63] However, the DHS worker further testified on redirect that Mother and Father are a married couple that live together, that Mother had been aware of Father's alcohol abuse as a condition which needed to be corrected, and that Mother "never offered to separate from [Father] and raise [the Children] on her own." [64]

¶ 32 In his testimony, Father conceded that he was "guilty for the drinking of alcohol," but also testified that he had been sober for the last eight months.[65] Mother's testimony contradicted the DHS worker's testimony regarding her relationship to Father. She testified that she told the DHS worker that she would "make [Father] leave my home if stuff was not completed." [66] She

said, "I sat up here in court and told them if there was one screw-up, one mess-up that he was gone, so I don't understand why [the DHS worker] would sit up here and say that I didn't say none of that." The attorney for Mother and Father also reported to the court, "Mother wants the Court to know that Father has stated he's willing to move out of the home since [Mother] has corrected the conditions." [67]

¶ 33 After hearing testimony from all parties, the trial judge made the following findings and termination order:

> The Court finds that … [DHS] has gone above and beyond the call trying to give these parents opportunities to correct all of the conditions. And the agreement was, at the time, in January, that if the parents do not correct all the conditions, that the Court would accept the relinquishment of parental rights that was placed in effect in January.
>
> . . . .
>
> And I—therefore, based upon the fact that the agreement; that was entered at the time, I believe was a reasonable agreement, that the parents have not complied with all the conditions that were set out; and that as of this morning, the parents were still together, the Court finds that the agreement … will be accepted and finalized and the Court will adopt the relinquishment entered in January and terminate the parents' rights.[68]

¶ 34 Finding his decision to be in the best interests of the Children, the trial judge

58. The DHS-approved substance abuse provider dismissed Father from the program in October because he missed drug tests and counseling sessions in September and October. According to the reports, Father's reasons for missing sessions and drug tests were his need to work and finances. Tr., November 10th Hearing, Court's Exhibit 1.

59. *Id.* at pp. 15–16.

60. *Id.* at p. 8.

61. State asked the court to adopt the report and other reports from the DHS-approved substance abuse provider and CASA, but the Mending Hearts report is not attached to the transcript. However, the report was filed with the court on November 14, 2011, and indicates that Father did have random drug tests on September 22 and

October 4th and 15th. R., pp. 306–10. According to Father's attorney, those tests were conducted at Father's work site. Tr., November 10th Hearing, p. 15.

62. *Id.* at pp. 12–13.

63. *Id.* at p. 17.

64. *Id.* at pp. 17–18.

65. *Id.* at p. 20.

66. *Id.* at p. 25.

67. *Id.* at p. 19.

68. *Id.* at p. 25–26.

adopted the relinquishments in accordance with the terms of the settlement agreement.[69] The district court memorialized its Order terminating the Mother's and Father's parental rights because they "Consented to Termination (Relinquishment)—failed to comply with conditional relinquishment."[70] It is from this Order that Mother appeals.[71]

## STANDARD OF REVIEW

■ ¶ 35 Where a parent's "fundamental due process rights ... are in danger of termination" pursuant to an alternative dispute resolution process, our review is one of strict judicial scrutiny. *In re T.D.*, 2001 OK CIV APP 92, ¶ 14, 28 P.3d 1163, 1167 (relying on *In re Adoption of Blevins*, 1984 OK CIV APP 41, ¶¶ 8–9, 695 P.2d 556, 559–60).

## ANALYSIS

¶ 36 Mother argues the court should not have enforced her relinquishment because it was adopted by the court nearly 10 months after it was executed and not at the "next Court date."[72] She also argues that, in any event, she met the conditions of the voluntary relinquishment. For the reasons discussed herein, we conclude that the trial court erred in accepting the relinquishment upon a finding that Mother failed to meet the conditions of the negotiated agreement among Mother, Father, State and the Children's attorney, and remand to the trial court to conduct a hearing to determine whether there are grounds for the involuntary termination of Mother's parental rights pursuant to 10A O.S.2011 § 1–4–904.

■ ¶ 37 Preliminarily, as State concedes,[73] this is not a case in which the trial court terminated Mother's parental rights after making specific findings pursuant to § 1–4–904 that termination was based upon an enumerated statutory legal ground, specifically § 1–4–904(B)(5).[74] In such cases, where termination is based on the parent's failure to correct conditions that led to an adjudication of deprivation, the specific conditions the parent failed to correct must be stated. *See, e.g., In re R.A.*, 2012 OK CIV APP 65, ¶ 17, 280 P.3d 366, 372. *See also In re L.S.*, 1990 OK CIV APP 94, ¶ 16, 805 P.2d 120, 123–24. Moreover, the state must prove by clear and convincing evidence the statutory requirements for termination, and the factual findings made must be supported by that evidence. *In re S.B.C.*, 2002 OK 83, ¶¶ 6–7, 64 P.3d 1080, 1082–83.

¶ 38 Instead, Mother's rights were terminated because the court accepted a "conditional relinquishment" pursuant to the settlement agreement that was executed by Mother 10 months prior to the court's adoption of it. The court accepted the relinquishment because it found Mother had not met "all the conditions" of the settlement agreement and that accepting the relinquishment was in the best interests of the Children. Specifically, the court stated, "the agreement was ... that if the *parents* do not correct all of the conditions, that the Court would accept the relinquishment of parental rights that was placed in effect in January."[75] It further stated:

> based upon the fact that the agreement ... was a reasonable agreement, that the

---

69. *Id.*

70. R., p. 304.

71. R., pp. 303–305. Father has not appealed from the Order.

72. Mother's Brief–in–Chief, p. 5.

73. Mother argues in her brief that State based the termination on the statutory provisions pursuant to § 1–4–904(B)(1) & (5) and that State failed to prove by clear and convincing evidence of the statutory grounds for involuntary termination. Mother's Brief–in–Chief, pp. 3–4 & 6. However, Mother does not dispute that a settlement agreement was entered and her argument on appeal rests on her contention that she met its conditions. *Id.* at p. 4.

74. State's Brief, p. 11. Nor does State argue that Mother's relinquishment falls within § 1–4–904(B)(1). Throughout the proceedings, the trial court and the parties have described the relinquishment as "conditional." Nothing in § 1–4–904(B)(1) speaks to relinquishments as being conditional. The provision is quite clear that a "voluntary consent ... is effective when it is signed and may not be revoked" absent fraud or duress. *Id.* at § 1–4–904(B)(1)(b).

75. Tr., November 10th Hearing, p. 25 (emphasis added).

parents have not complied with all of the conditions that were set out; *and that as of this morning, the parents were still together,* the Court finds that the agreement ... will be accepted and finalized and the Court will adopt the relinquishment entered in January and terminate the parents' rights.[76]

¶ 39 Though not referenced by either party, 10A O.S.2011 § 1–4–504[77] provides an alternative dispute resolution process "[a]t any stage of the proceedings," including the parties' voluntary participation in a settlement conference. *Id.* at § 1–4–504(A)(3). Moreover, while "[a]ny resolution agreed to by the parties" as a result of their settlement conference "shall not be binding on the court," the statutory language clearly contemplates that such agreements might be reached by the parties and adopted by the court. *Id.* at § 1–4–504(B). The record shows the statutory alternative dispute resolution process was used by the parties to reach the January 2011 settlement agreement. Consequently, Mother's arguments as to its enforcement rest on the meaning of the settlement agreement as set out in the court's Order and on the documents to which that agreement refers.

¶ 40 The concern previously expressed by this Court, however, in *T.D.* with the use of the alternative dispute resolution process "in a proceeding involving the termination of parental rights for *cause*" remains despite the enactment of § 1–4–504. 2001 OK CIV APP 92, ¶ 9, 28 P.3d at 1166. Although the legislature has now provided for the use of a settlement process in termination proceedings, nothing in the statutory language of § 1–4–504 states that the legislature has retreated from the "procedural safeguards specified by the legislature when it enacted the voluntary relinquishment statutes." *T.D.*, ¶ 19, 28 P.3d at 1168.

¶ 41 The express language of § 1–4–504(B), that the resolution reached by the parties "shall not be binding on the court," supports the legislative imperative that the courts ensure those safeguards are met. Moreover, as we observed in *T.D.*, a parent participating in an alternative dispute resolution process does not have equal bargaining power with the state in a termination proceeding. *Id.* ¶ 17, 28 P.3d at 1168 (relying on *Hagar v. State,* 1999 OK CR 35, ¶ 4, 990 P.2d 894, 896). Consequently, we apply strict judicial scrutiny to the terms of the agreement as set forth in the trial court's Order adopting the settlement agreement.

*A. Enforceability of the settlement agreement: Mother failed to raise below the issue of the duration of the relinquishment, thus, the issue is waived and will not be considered on appeal.*

¶ 42 Mother argues the termination Order should be set aside because the relinquishment she executed pursuant to the settlement agreement was only valid until the next court date.[78] She does not argue that she executed the agreement under fraud, undue influence, duress, or mistake.[79] Instead, Mother asserts that the agreement was only valid until the *next* court date and could not be "held in perpetuity" by the court for an indefinite period.[80] Therefore, the court erred in enforcing the agreement and adopting her relinquishment in November, 2011, because two other review hearings occurred prior to that time. Mother raises this contention of error for the first time on appeal.

¶ 43 At the January 2011 hearing the attorneys for both Mother and State agreed that the relinquishment would be either adopted or destroyed at the next court

---

76. *Id.* at 26 (emphasis added).

77. This statutory provision became effective May 21, 2009.

78. A review hearing scheduled for May 5, 2011, was stricken because the trial judge was out of town. The matter was set for further hearing on May 26th. R., p. 258.

79. A settlement agreement will be enforced as a contract and is valid "absent 'fraud, duress, undue influence, or mistake.'" *T.D.*, 2001 OK CIV APP 92, ¶ 10, 28 P.3d at 1166 (quoting *Vela v. Hope Lumber & Supply Co.*, 1998 OK CIV APP 162, ¶ 6, 966 P.2d 1196, 1198).

80. Mother's Brief–in–Chief, p. 5.

date.[81] However, appellate review is limited to legal issues that have been previously raised and addressed at the trial court. *T.D.*, ¶ 11, 28 P.3d at 1166. "Matters not first presented to the trial court for resolution are generally not considered on appeal." *Id.* (quoting *Stonecipher v. District Court*, 1998 OK 122, ¶ 11, 970 P.2d 182, 186). In *T.D.*, we held that the mother's fraud argument had been waived because the trial court never had the opportunity to rule on this issue. *Id.*

¶ 44 In the present action, Mother's argument is deficient for appellate review by this Court because the alleged error was never brought to the trial court's attention. Though represented by counsel throughout the proceedings, Mother did not ask the trial court to void the settlement agreement and destroy her executed relinquishment at any stage of the proceedings. *Cf.*: 10A O.S.2011 § 1-4-504(B) (parties who are ordered by the court to an alternative dispute resolution process have the opportunity to file a motion to object to participation). Prior to the termination Order in November, two reviews were conducted in May and September of 2011. Mother did not file a motion to withdraw, or objection to, the settlement agreement at either review. She also failed to object at the November 2011 hearing when State moved to terminate the parents' parental rights pursuant to the ordered settlement agreement. Instead, Mother made arguments that she had complied with the terms of the settlement agreement and treated the agreement as if it were in full effect. Thus, the trial court was given no opportunity to determine whether the agreement expired by its own terms and, as a result, Mother's relinquishment should not be enforced.

¶ 45 Because Mother had numerous opportunities below to raise and contest the "next court date" condition of the agreement but failed to do so, we conclude that this basis for non-enforcement of the agreement was waived by Mother and will not be considered on appeal.

**B. Enforcement of the settlement agreement: Mother met the conditions and, thus, termination of her parental rights should not have been based on her relinquishment.**

 ¶ 46 Although Mother waived her objection as to one of the terms of the settlement agreement because she did not first raise the issue with the trial court, Mother raised at trial the argument that she met the conditions of the agreement and that the relinquishment, therefore, should not have been adopted by the trial court. State argues Mother did not meet the conditions because she had not left Father or otherwise removed him from her home at the time of the November hearing and Father had not completed his condition relating to alcohol testing. Thus, the parties disagree about what the conditions—the terms—of the agreement are.

 ¶ 47 That the parties disagree about what the conditions of the agreement are does not in itself demonstrate there is ambiguity in the contract. Whether there is such an ambiguity is a question of law for the court. *Corbett v. Combined Comm'ns Corp. of Okla., Inc.*, 1982 OK 135, ¶ 5, 654 P.2d 616, 617. Under Oklahoma law, the primary consideration in interpreting a contract is to determine the parties' intent. *Lindhorst v. Wright*, 1980 OK CIV APP 42, ¶ 8, 616 P.2d 450, 453; 15 O.S.2011 § 152 ("[a] contract must be so interpreted as to give effect to the mutual intention of the parties, as it existed at the time of contracting, so far as the same is ascertainable...."). Moreover, "where no ambiguity exists in the language used, the intent must be determined from the words used, unless there is fraud, accident, or pure absurdity." *Lindhorst*, ¶ 8, 616 P.2d at 453 (citations omitted); 15 O.S.2011 § 154 ("[t]he language of a contract is to govern its interpretation....").

---

81. At the January hearing, Mother's attorney stated for the record that the relinquishments were conditional and "that [Mother and Father] have the opportunity, until our next court date, to make progress, as the Court has said. And upon a finding of that and—or the parties' agree-ment of that, then the relinquishments will not be entered and will be destroyed." Tr., January 25th Hearing, p. 9. The trial court also stated that the relinquishment would be entered at the next court date if the conditions of the agreement were not met. *Id.* at p. 11.

¶ 48 The settlement agreement is set forth in the trial court's January 2011 order. The agreement set out conditions Father was required to meet. It set out conditions Mother was required to meet. It also incorporated the conditions Mother was required to meet that were set out in her ISP, which included the conditions Mother needed to correct that resulted in the adjudication of deprivation. The condition upon which the trial court and State focus is the condition that Mother was required to protect the Children from Father's substance abuse.

¶ 49 Mother contends that she met all of her individual ISP requirements and met the required conditions set out in the January 2011 order. The testimony of the DHS worker at the November 2011 hearing is clear that Mother met the conditions imposed upon her by the settlement agreement and met the conditions set out in her ISP as required by the court's January 2011 order. The ISP progress reports filed May 23rd and September 8th support that testimony. State argues, however, that she did not meet the conditions because she "continued to share a home with [Father] at the time of the hearing." [82] It argues that "[t]he unresolved condition in this case remained [Father's] substance abuse *and the requirement on the treatment plan that [Mother and Father] maintain a home free from substance abuse.*" [83] While it conceded she "did her ISP," it argues "never was the conditions [sic] of a home free from alcohol abuse" corrected by Mother.

¶ 50 Despite State's assertions, from the ISP filed March 30, 2009, through every ISP progress report filed thereafter of record, the only language in Mother's treatment plan that concerns "maintaining a home free from substance abuse" is found under the condition **"Risk Factor:** Child Well Being–Physical." It provides, in part, that Mother is required *"[a]fter reunification . . . [to]* provide a clean, safe, and stable home with working utilities. *The home will be free from alcohol,* drugs and criminal activity." [84] That this was a condition that had to be met after reunification is bolstered by the various ISP progress reports that stated under "progress" for this condition that the Children were not living with Mother at the time of the report. Thus, the ISP, the terms of which were incorporated into the settlement agreement as part of the conditions to be met by Mother, requires a home free from drugs and alcohol *after* the Children are reunited with Mother.

¶ 51 Moreover, the January 24, 2011 ISP progress report states under "Desired Result(s)" that Mother "will protect the [C]hildren from substance abuse by [Father]," but does not state that leaving Father *before* reunification is the form that protection had to take. [85] While Father's substance abuse testing was clearly an issue, nothing in the record on appeal states that as part of the settlement agreement—that as a condition to the court not adopting the relinquishment—Mother was required to leave Father if he failed to meet his condition of UA testing, [86] the only condition the DHS worker testified Father failed to meet through its approved substance abuse provider. [87]

¶ 52 Further, although the court stated that it was accepting the relinquishment because not "all the conditions" had been met, the actual understanding of Mother and State was that the relinquishments would not be adopted and would be destroyed if Mother made progress toward correcting the conditions. [88] Even if leaving Father could be said to be one of the conditions Mother had to meet, the court was informed at the November hearing that Father would leave the home if that was required inasmuch as Mother had met her conditions. Mother

82. State's Brief, p. 10.

83. *Id.* (emphasis added).

84. R., pp. 62–63 (emphasis added).

85. R., p. 247.

86. *See* Tr., January 25th Hearing, p. 9.

87. *Id.* at p. 10. We note, however, that the testimony is conflicting on this point. Though not a DHS-approved provider for Father, the Mending Hearts report reveals three random drug tests were performed by it in September and October and all were negative for alcohol.

88. Tr., January 25th Hearing, p. 9.

also testified that she would "make [Father] leave my home if stuff was not completed." Consequently, as of the date of the hearing, Mother and Father agreed Father would leave the home if that was the only matter left to resolve.

¶ 53 This Court has observed that "protracted foster care placement is generally not in children's best interests"; however, when a parent's parental rights are sought to be terminated, "termination is not a matter to be taken lightly by the courts...." *In re K.C.*, 2002 OK CIV APP 58, ¶¶ 17, 19, 46 P.3d 1289, 1293.

This court has often stressed that the right of a parent to the companionship, care, custody, and management of the child is a fundamental right protected by both the federal and state constitutions. *See* ... *In re M.C.*, 1999 OK CIV APP 128, ¶ 9, 993 P.2d 137, 140 ("It is fundamental in Oklahoma that 'the right of a parent to the care, custody, companionship and management of his or her child is a fundamental right protected by the Federal and State Constitutions.'"). *See also Alford v. Thomas*, 1957 OK 218, ¶ 21, 316 P.2d 188, 192 ("It has long been the rule of this Court that the parents have by nature, as well as by law, the legal right to the custody of their minor children. This right will always control the judgment of the courts, unless circumstances of great weight and importance connected with the necessary welfare of the child exists to overcome such strict legal right.").

*Id.* ¶ 18, 46 P.3d at 1293 (citation omitted).

¶ 54 Here, the terms of the settlement agreement, including the ISP and progress reports, do not contain language that states in order for Mother to protect the Children from Father's substance abuse—a condition that led to the deprived adjudication—Mother must remove Father from the home or she must otherwise leave Father. Moreover, the explicit language of the ISP states that "after reunification," Mother was obligated to maintain a home free from drug and alcohol abuse, language that might require Father's removal from the home. However, the November hearing was prior to reunification.

Thus, under the terms of the settlement agreement, that Mother was living with Father on the date of the hearing, does not demonstrate she failed to meet her conditions under the agreement. Even if the hearing date is construed as the date of reunification, Mother, through her attorney, informed the court that Father would leave the home because Mother met her conditions, and Mother testified that she would remove Father from the home if he did not meet his conditions. Therefore, the evidence before the court was that the condition was met. We conclude, therefore, the trial court erred in terminating Mother's parental rights by enforcing her relinquishment.

¶ 55 Though the circumstances of deprivation here are different from those in *T.D.*, as then, we are deeply troubled by the plight of the Children. We recognize that the trial court and State are clearly concerned about the amount of time the Children have spent in foster care and away from Mother's home following the first adjudication in 2008. They are clearly concerned about the amount of time—an additional nearly 10 months—from the January 2011 settlement agreement until the November hearing that it took Mother to correct the conditions enumerated in the January 2011 order. The concern of the court and State is clearly for the Children, the youngest of whom has never lived with her Mother and who appears to regard her foster parents as her parents.[89]

¶ 56 However, as we stressed in *T.D.*, in reversing the Order, we are not returning this case or the Children to the beginning of the process. "All that remains is for the trial court to conduct a hearing to determine ... whether ... there are sufficient grounds for the involuntary termination of Mother's parental rights" pursuant to 10A O.S.2011 § 1–4–904(B). *T.D.*, ¶ 20, 28 P.3d at 1168–69.

### CONCLUSION

¶ 57 Based on the record on appeal, we conclude that Mother waived her objection to enforcement of the settlement agreement on the grounds that it expired by its own terms. Despite the numerous opportunities she had to raise that argument, she failed to raise it

---

89. Tr., November 10th Hearing, pp. 13–14 & 18; *see also* R., pp. 231 & 281.

with the trial court and acted at all times as if the agreement was still in effect. However, we further conclude that under the terms of the agreement and the documents to which it referred, Mother met the conditions of the agreement. Consequently, the trial court erred in adopting her "conditional relinquishment" as the means by which to terminate her parental rights. We, therefore, reverse the Order and remand the cause for a hearing to determine whether Mother's parental rights should be involuntarily terminated pursuant to 10A O.S.2011 § 1–4–904.

¶ 58 **REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.**

FISCHER, C.J., and WISEMAN, J., concur.

